**ORAL ARGUMENT NOT YET SCHEDULED      INITIAL FORM**

## No. 21-1244
### (Consolidated with Nos. 21-1243 and 21-1245)

IN THE

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

SOUNDEXCHANGE, INC.,
*Petitioner,*

v.

COPYRIGHT ROYALTY JUDGES,
*Respondents,*

NATIONAL RELIGIOUS BROADCASTERS
NONCOMMERICAL MUSIC LICENSE COMMITTEE, ET AL.,
*Intervenors.*

On Appeal from an Order of
The Copyright Royalty Board

## OPENING BRIEF OF PETITIONER SOUNDEXCHANGE, INC.

TIM DADSON
*General Counsel*
BRAD PRENDERGAST
*Assistant General Counsel*
SOUNDEXCHANGE, INC.
733 10th Street, NW
10th Floor
Washington, D.C. 20001
Tel: (202) 640-5858

MATTHEW S. HELLMAN
ERIC E. PETRY
VICTORIA HALL-PALERM
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
MHellman@jenner.com

*Counsel for SoundExchange, Inc.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioner SoundExchange, Inc. ("SoundExchange") certifies as follows:

**A.     Parties and Amici.** The following parties participated in the proceeding before the Copyright Royalty Board ("CRB"):[†] SoundExchange; Pandora Media, LLC; Sirius XM Radio, Inc.; National Religious Broadcasters Noncommercial Music License Committee ("NRBNMLC"); National Association of Broadcasters ("NAB"); and Google Inc.

---

[†] SoundExchange filed jointly on behalf of itself and participants The American Federation of Musicians of the United States and Canada; Screen Actors Guild/American Federation of Television and Radio Artists; The American Association of Independent Music; Sony Music Entertainment; UMG Recordings, Inc.; Warner Music Group Corp.; and Jagjaguwar Inc. Additionally, AccuRadio LLC; Live365 Broadcaster LLC; LA RAZA MEDIA GROUP LLC; Radio Coalition LLC; Feed Media, Inc.; Dash Radio, Inc.; TuneIn Inc.; Radio Paradise Inc.; iHeartMedia, Inc.; and ICON Health & Fitness Inc. filed petitions to participate in the proceeding, but withdrew from the proceeding before commencement of the hearing. College Broadcasters Inc. and National Public Radio filed petitions to participate in the proceeding, but then reached a settlement with SoundExchange and thus withdrew from the proceeding. David Powell filed a petition to participate in the proceeding but was dismissed from the proceeding. And Educational Media Foundation filed a petition to participate in the proceeding, but then joined the case of NRBNMLC and thus withdrew from the proceeding.

No amicus appeared before the CRB in the proceedings below.

The parties before this Court are: SoundExchange; the Copyright Royalty Board; and the Librarian of Congress.

In addition, NRBNMLC is participating as an Intervenor in this case.

There are no known amici in this case.

**B.    Rulings Under Review.** The ruling under review is the *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, 86 Fed. Reg. 59,452 (Oct. 27, 2021) (codified at 37 C.F.R. Part 380). Because the ruling as published in the *Federal Register* redacts certain confidential and competitively sensitive information provided by the parties to the Copyright Royalty Judges constituting the Copyright Royalty Board ("CRB"), and because it is necessary for this Court to consider that information in deciding certain issues in this appeal, this brief cites the unredacted version of the ruling issued by the CRB. J.A. __ - J.A. __. A redacted public version of that ruling, paginated in the same manner as the unredacted version, was released by the CRB. J.A. __ - J.A. __.

**C.     Related Cases.** This case has not previously come before this Court, or any other court. SoundExchange is unaware of any other related cases besides the other petitions from the Determination, which the Court has consolidated with this case.

**D.     Deferred Appendix.** A deferred appendix will be used, pursuant to this Court's Order of April 28, 2022.

July 27, 2022                                    /s/ Matthew S. Hellman
                                                Matthew S. Hellman

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rules 26.1 and 28(a)(1), SoundExchange submits the following corporate disclosure statement:

SoundExchange is a non-profit collective management organization representing the owners of sound recording copyrights and the artists who created those recordings. SoundExchange collects royalties paid pursuant to statutory licenses under Sections 112 and 114 of the Copyright Act, 17 U.S.C. §§ 112, 114, which allow the public performance of sound recordings by means of certain digital audio transmissions, along with related reproductions. SoundExchange distributes these royalties to the artists who created the sound recordings and the copyright owners of the sound recordings. SoundExchange has not issued any shares or debt securities to the public, and SoundExchange has no parent companies. SoundExchange has no subsidiaries or affiliates that have issued any shares or debt securities to the public. No publicly-held company has any ownership interest in SoundExchange. Because SoundExchange is a trade association as defined in D.C. Circuit Rule 26.l(b), it is not required to disclose the names of its members.

Because SoundExchange distributes statutory royalties to the artists who created the sound recordings and the owners of the copyrights in the sound recordings, those artists and owners may have an interest in the royalty rates at issue in this appeal. Certain publicly-traded companies receive, directly or indirectly through a subsidiary, royalties distributed by SoundExchange.

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................................i

CORPORATE DISCLOSURE STATEMENT ..........................................iv

TABLE OF AUTHORITIES ...................................................................viii

GLOSSARY ............................................................................................xi

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES...................................................................... 1

STATUTES AND REGULATIONS ......................................................... 2

STATEMENT OF THE CASE ................................................................ 2

      A.    Statutory and Regulatory Background ................................. 6

           1.    Statutory Licenses ......................................................... 7

           2.    Copyright Royalty Board ............................................... 8

           3.    Willing Buyer/Willing Seller Standard ....................... 10

           4.    Benchmarking.............................................................. 11

           5.    Opportunity Cost "Floor" ............................................ 12

      B.    Determination Below ......................................................... 15

           1.    Evidence of Opportunity Cost...................................... 15

           2.    The CRB Adopted a Misreading of Professor Shapiro's Opportunity Cost Testimony and Did Not Consider Professor Willig's Uncontroverted Corrections ................................................................ 21

           3.    The CRB Adopted a Rate Below Opportunity Cost............................................................................. 24

SUMMARY OF ARGUMENT ................................................................ 26

STANDING ........................................................................................... 28

ARGUMENT ......................................................................................... 29

I.     The CRB's Decision to Set the Statutory Royalty Rate for
       Ad-Supported Noninteractive Services Below Opportunity
       Cost Was Contrary to Law and Arbitrary and Capricious ........... 29

       A.    Agencies Must Comply with the Law and Give
             Reasons for Their Decisions ................................................. 30

       B.    The CRB Acted Unlawfully by Setting a Rate Below
             Opportunity Cost ................................................................. 32

II.    It Was Legal Error for the CRB to Ignore Record Evidence
       That Opportunity Cost Was Higher Than It Found ..................... 37

CONCLUSION ...................................................................................... 41

CERTIFICATE OF COMPLIANCE ....................................................... 43

CERTIFICATE OF SERVICE ............................................................... 44

# TABLE OF AUTHORITIES*

CASES

*City of Clarksville v. FERC*, 888 F.3d 477 (D.C. Cir. 2018) ................... 31

*El Rio Santa Cruz Neighborhood Health Center, Inc. v. United States Department of Health & Human Services*, 396 F.3d 1265 (D.C. Cir. 2005) ..................................................................... 41

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ..................... 36

*Growth Energy v. EPA*, 5 F.4th 1 (D.C. Cir. 2021) ................................. 31

\*Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*, 574 F.3d 748 (D.C. Cir. 2009) ..................................... 11, 32, 33

\*Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 796 F.3d 111 (D.C. Cir. 2015) .................................... 10, 34, 35

*Morall v. DEA*, 412 F.3d 165 (D.C. Cir. 2005) ....................................... 40

\*Motor Vehicle Manufacturers Ass'n of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983)................................................................... 30, 31, 36

*Music Choice v. Copyright Royalty Board*, 774 F.3d 1000 (D.C. Cir. 2014)................................................................. 32

*National Lifeline Ass'n v. FCC*, 921 F.3d 1102 (D.C. Cir. 2019) ...... 31, 36

*Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) ..................................................... 36

*Public Citizen, Inc. v. FAA*, 988 F.2d 186 (D.C. Cir. 1993) ................... 31

*Robinson v. National Transportation Safety Board*, 28 F.3d 210 (D.C. Cir. 1994) ..................................................... 41

---

* Authorities upon which we chiefly rely are marked with an asterisk.

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ................................. 29

*SoundExchange, Inc. v. Copyright Royalty Board*, 904 F.3d 41
(D.C. Cir. 2018) .................................................................................... 35

**STATUTES**

5 U.S.C. § 706 ....................................................................................... 30, 37

17 U.S.C. § 106 ............................................................................................ 7

17 U.S.C. § 106(1) ........................................................................................ 7

17 U.S.C. § 106(6) ........................................................................................ 7

17 U.S.C. § 112(e) ........................................................................................ 7

17 U.S.C. § 112(e)(3) .................................................................................... 1

17 U.S.C. § 114(d)(2) ................................................................................ 2, 7

17 U.S.C. § 114(d)(2)(A)(i) .......................................................................... 8

17 U.S.C. § 114(f) ......................................................................................... 7

17 U.S.C. § 114(f)(1) .................................................................................... 1

17 U.S.C. § 114(f)(1)(B) .......................................................................... 3, 34

17 U.S.C. § 114(f)(1)(B)(i) ......................................................................... 11

17 U.S.C. § 114(f)(1)(B)(i)(I) ..................................................................... 11

17 U.S.C. § 114(f)(1)(B)(i)(II) .................................................................... 11

17 U.S.C. § 114(j)(6) ................................................................................... 8

17 U.S.C. § 114(j)(7) ................................................................................... 8

17 U.S.C. § 114(j)(8) ................................................................................... 8

17 U.S.C. § 801 ............................................................................................ 8

17 U.S.C. § 801(b)(1) ................................................................................... 1

17 U.S.C. § 803(a)(1)...................................................................... 10, 32

17 U.S.C. § 803(d)(1) ......................................................................... 1

17 U.S.C. § 804(b)(3)(A)..................................................................... 8

**OTHER AUTHORITIES**

37 C.F.R. § 380.7 ............................................................................ 15

*Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, 86 Fed. Reg. 59,452 (Oct. 27, 2021) (codified at 37 C.F.R. pt. 380) ...................................... 1

*Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45,240 (July 8, 2002)................................................. 9, 11

*\*Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26,316 (May 2, 2016) .. 9, 10, 13, 34

*Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords III)*, 84 Fed. Reg. 1918 (Feb. 5, 2019).............................................................. 10

*\*Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III)*, 83 Fed. Reg. 65,210 (Dec. 19, 2018)....................................................................... 9, 13, 34

*Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) ...................................................................... 9

*\*Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24,084 (May 1, 2007) ....................... 9, 11, 12

# GLOSSARY

The following abbreviations or terms are used in this brief.

| CRB | Copyright Royalty Board |
|---|---|
| CWDT | Corrected Written Direct Testimony |
| *Phonorecords III* | *Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords III)*, 84 Fed. Reg. 1918 (Feb. 5, 2019) |
| *SDARS III* | *Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III)*, 83 Fed. Reg. 65,210 (Dec. 19, 2018) |
| *Web I* | *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45,240 (July 8, 2002) |
| *Web II* | *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24,084 (May 1, 2007) |
| *Web III* | *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) |
| *Web IV* | *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26,316 (May 2, 2016) |
| *Web V* | *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, 86 Fed. Reg. 59,452 (Oct. 27, 2021) |

| WRT | Written Rebuttal Testimony |
|-----|---------------------------|

## JURISDICTIONAL STATEMENT

The CRB published its Final Determination in the *Federal Register* on October 27, 2021. *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances (Web V)*, 86 Fed. Reg. 59,452 (Oct. 27, 2021) (codified at 37 C.F.R. Part 380). The CRB had jurisdiction under 17 U.S.C. §§ 112(e)(3), 114(f)(1), and 801(b)(1). Petitioner SoundExchange filed a timely petition for review on November 26, 2021, pursuant to 17 U.S.C. § 803(d)(1). This Court has jurisdiction over the matters in this case pursuant to 17 U.S.C. § 803(d)(1). Venue lies in this Court pursuant to 17 U.S.C. § 803(d)(1).

## STATEMENT OF ISSUES

1.    Whether the CRB acted contrary to law and arbitrarily and capriciously by setting a rate below the sellers' opportunity cost for certain ad-supported noninteractive webcasting services, where (i) the governing statute requires the CRB to set a rate a willing seller would accept, (ii) the CRB and parties recognized that a willing seller would not sell below its opportunity cost, and (iii) the CRB did not address, let alone justify, its decision to set a rate below the opportunity cost it adopted.

1

2.    Whether the CRB further acted contrary to law and arbitrarily and capriciously when it (i) based its opportunity cost finding on a misreading of an expert's testimony, and (ii) refused to consider evidence relevant to calculating opportunity cost based on a mistaken belief that the evidence was not part of the record.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the addendum to this brief.

## STATEMENT OF THE CASE

At the heart of this appeal is a basic economic truth incorporated into the governing legal standard for the proceeding below: no seller will voluntarily sell its product for a lower price than it can get elsewhere—*i.e.* its opportunity cost.[1]

In the Copyright Act, Congress provided a statutory license for certain internet webcasters. 17 U.S.C. § 114(d)(2). That license entitles those webcasters to use on their services all commercially-released sound recordings, regardless of whether that use was approved by the artists

---

[1] "The opportunity cost of anything of value is what you must give up to get it." J.A. __ (slip op. 164 n.220) (quoting John Quiggin, *Economics in Two Lessons: Why Markets Work So Well, and Why They Can Fail So Badly* 15 (2019)).

and copyright owners, represented here by Petitioner SoundExchange. In exchange for that privilege, Congress required the webcasters to pay a fair market value royalty—*i.e.*, one "that would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(1)(B). The CRB is tasked with setting such rates in proceedings such as the one below.

At the trial below, it was uncontested that licensing recordings to webcasters eligible for the statutory license would reduce payments to artists and copyright owners from other forms of music distribution, such as on-demand streaming services, satellite radio, digital downloads, CDs, and vinyl records. This lost revenue represented the opportunity cost of licensing to the webcasters at issue. The parties also agreed—consistent with prior CRB determinations—that a statutory rate set below the sellers' opportunity cost would not satisfy the willing buyer/willing seller standard. After all, no willing seller would give up *more* to get *less*.

Yet without explanation—or even an acknowledgment of the discrepancy—the CRB set a royalty rate for ad-supported noninteractive webcasters below the opportunity cost figure it adopted. In other words, the CRB set a royalty rate that yields payments *less* than the revenue

3

the CRB thought copyright owners and artists would earn if such webcasting was unavailable and consumers instead listened to music through other sources. No willing seller would accept that rate. The CRB's error violates its statutory mandate and will cost the copyright owners and artists represented by SoundExchange tens of millions of dollars in lost royalties.

The CRB did not just err in setting a rate below opportunity cost, it also erred in calculating the opportunity cost itself. The CRB credited testimony from a webcaster's expert that it claimed supported an opportunity cost of $0.00222 per webcast performance.[2] But that expert did *not* find that the relevant opportunity cost was $0.00222. Rather, his testimony was that the opportunity cost was $0.00222 *plus* an additional amount associated with lost revenues from another kind of music service. The CRB did not acknowledge or account for that additional opportunity cost. The expert's complete estimate yielded an opportunity cost of

---

[2] In its Determination, the CRB generally rounded per-performance royalties to four decimal places, but it provided no explanation or justification for its decision to do so. In this brief, SoundExchange uses the more accurate numbers from the record (five decimal places). This difference translates to millions of dollars in royalties over the rate period.

$0.00233, not $0.00222. Again, that is a difference of millions of dollars of royalties given the hundreds of billions of streams at issue over the license period.

The CRB also failed to consider other material record evidence of opportunity cost. SoundExchange's economic expert Professor Willig presented testimony that a component of the opportunity cost calculation eventually adopted by the CRB needed to be adjusted upward. The CRB rejected that adjustment not on the merits, but solely on the basis that the adjustment had been excluded from the record based on an objection from opposing counsel. Yet no objection was ever lodged to the testimony Professor Willig gave about the adjustment. And, in any event, the objection the CRB cited (which related to anticipated additional testimony) was never sustained. The CRB did not rule on that objection, and the objecting counsel affirmatively withdrew it.

The Determination thus rests on multiple intertwined errors. *First*, it was legal error to set a rate below opportunity cost because the statute requires the CRB to set a rate that a willing seller would accept. No willing seller would sell at a rate that yields a net loss. *Second*, although no rational justification could exist, the CRB's failure to provide any

explanation for its decision to set a rate below opportunity cost was arbitrary and capricious. That unexplained decision ran counter to what the CRB had held in prior proceedings and the testimony from both sides' experts at trial. *Third*, the CRB employed the wrong measure of opportunity cost. The CRB misstated the testimony of the expert it relied upon, and it ignored other relevant testimony solely because it mistakenly believed that testimony had been excluded. Had the CRB considered this testimony, it would have been obligated to find a still-higher opportunity cost, and to set the royalty rate at or above that floor.

For all these reasons and as explained further below, SoundExchange asks that the Determination be vacated and remanded in relevant part with instruction that the CRB set the rate for ad-supported noninteractive services no lower than the opportunity cost established by the record, and at a minimum, no lower than $0.00233 per performance.

## A.    Statutory and Regulatory Background

This is an appeal brought by SoundExchange, the representative of sound recording copyright owners and recording artists, from a decision of the CRB establishing the royalty rates that certain webcasters will pay

6

for a statutory license to transmit music and other sound recordings over the five-year rate period 2021-2025.

### 1. Statutory Licenses

The Copyright Act grants copyright owners certain exclusive rights to their works. 17 U.S.C. § 106. In the case of sound recordings, the type of work at issue here, those rights include the exclusive rights to reproduce their recordings and perform them publicly "by means of . . . digital audio transmission[s]." 17 U.S.C. § 106(1), (6). These rights are subject to statutory licenses, meaning that eligible digital music services that comply with statutory license requirements, including payment of royalties, may reproduce and publicly perform sound recordings in certain ways without the copyright owner's authorization. *See, e.g.*, 17 U.S.C. §§ 112(e), 114(d)(2), (f).

Sound recording statutory licenses are available to digital services like internet webcasters that are "noninteractive"—that is, services that, among other things, do not transmit a specific sound recording in response to a user's request. In contrast to these radio-like services, "interactive" services like Spotify provide "on demand" functionality and are therefore ineligible for a statutory license. They must, therefore,

reach negotiated agreements with copyright owners to perform recordings lawfully. *See* 17 U.S.C. § 114(d)(2)(A)(i), (j)(7).

The statutory provisions distinguish among different types of services. As relevant here, the proceeding below was to set rates for (i) services that are free to consumers and generate revenue through advertisements ("ad-supported" services, or in the words of the statute, services making "eligible nonsubscription transmissions") and (ii) services that require a consumer to pay a subscription fee ("new subscription services"). *See* 17 U.S.C. §§ 114(j)(6), (8), 804(b)(3)(A).

## 2. Copyright Royalty Board

The Copyright Act does not itself prescribe royalty rates for the sound recording statutory licenses, instead assigning that task to the Copyright Royalty Judges constituting the CRB, an administrative body that is part of the Library of Congress. 17 U.S.C. § 801. Every five years, the CRB holds proceedings to set statutory royalty rates and terms for the upcoming five-year period for performances by webcasters and reproduction of so-called "ephemeral" copies used to facilitate those performances. 17 U.S.C. § 804(b)(3)(A).

8

The proceeding below—*Web V*—was the fifth webcasting proceeding, covering the 2021-2025 period. The *Web V* Determination drew on the analysis from the prior four webcasting decisions: *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45,240 (July 8, 2002) ("*Web I*"); *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24,084 (May 1, 2007) ("*Web II*"); *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23,102 (Apr. 25, 2014) ("*Web III*") (on remand from this Court); and *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26,316 (May 2, 2016) ("*Web IV*"). In separate proceedings, the CRB also sets statutory rates for other types of services, as well as rates under other statutory licenses. These other proceedings often raise issues similar to those addressed in webcasting proceedings. *See, e.g.*, *Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III)*, 83 Fed. Reg. 65,210 (Dec. 19, 2018) (setting royalty rates

applicable to use of sound recordings by satellite radio); *Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (Phonorecords III)*, 84 Fed. Reg. 1918 (Feb. 5, 2019) (setting royalty rates applicable to the reproduction and distribution of musical works).

Although the CRB is not subject to plenary review by any superior official in the Executive Branch, it is generally subject to principles of administrative law and bound by its own decisions and by "prior determinations and interpretations of," *inter alia*, the Librarian of Congress and the Register of Copyrights. 17 U.S.C. § 803(a)(1).

### 3. Willing Buyer/Willing Seller Standard

"[T]he Copyright Act directs the [CRB] to 'establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller' if the webcasting statutory license did not exist." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 131 (D.C. Cir. 2015) (quoting a provision since redesignated as 17 U.S.C. § 114(f)(1)(B)). In doing so, the CRB looks to a hypothetical marketplace "free of the influence of compulsory, statutory licenses," *Web IV*, 81 Fed. Reg. at 26,316, where the sellers are the record companies and the product being

10

sold is a "blanket license for each . . . record company's complete repertoire of sound recordings." *Web II*, 72 Fed. Reg. at 24,091 (quoting *Web I*, 67 Fed. Reg. at 45,244).

In establishing rates and terms that satisfy the willing buyer/willing seller standard, the CRB considers "economic, competitive, and programming information presented by the parties." 17 U.S.C. § 114(f)(1)(B)(i). It "may consider the rates and terms for comparable types of digital audio transmission services and comparable circumstances under voluntary license agreements." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 753-54 (D.C. Cir. 2009) (quoting redesignated provision 17 U.S.C. § 114(f)(1)(B)(ii)). And it may consider how webcasting may affect "copyright owner[s'] other streams of revenue" and the "relative roles" of copyright owners and webcasters. 17 U.S.C. § 114(f)(1)(B)(i)(I), (II).

### 4. Benchmarking

Since *Web I*, agreements voluntarily negotiated between private parties have been used as "benchmarks" to determine willing buyer/willing seller rates for webcasting. *See Web I*, 67 Fed. Reg. at 45,246-49. To set rates based on benchmarks, the CRB typically begins

by identifying a set of comparable agreements negotiated in unregulated markets. It then adjusts the rates found in those benchmark agreements to account for any differences between the benchmark (unregulated) and target (statutory) markets. *See Web II*, 72 Fed. Reg. at 24,092.

### 5. Opportunity Cost "Floor"

The CRB has recognized and endorsed the economic principle that no willing seller would sell at a price below its opportunity cost. In the recorded music industry, that means no copyright owner would license use of its sound recordings for less than it would otherwise earn. If licensing to a webcaster would cause consumers to spend less on digital downloads, or on subscriptions to satellite radio, then that licensing decision has an associated opportunity cost. The royalties paid by the webcaster must at least cover that opportunity cost for the license to make economic sense for the copyright owner. *See, e.g.*, J.A. __ (Willig CWDT ¶ 24); J.A. __ (Shapiro CWDT at 13, 15); J.A. __ (8/5/20 Tr. 407:6-408:2 (Willig)); *see also* J.A. __ (slip op. 61 n.77); J.A. __ (slip op. 180 n.246); J.A. __ (slip op. 179-80 & n.246).

Thus, as the CRB explained in *Web IV*, "[o]n the *licensors'* side of the market (the sellers' side), the limit on the willingness to supply

recordings at reduced rates is reached when the licensor determines that any further reduction in the rate will not be sufficient to cover all marginal and recurring fixed costs (*including opportunity costs*) for its particular repertoire." 81 Fed. Reg. at 26,366 (second emphasis added). The CRB reiterated in *SDARS III* that opportunity cost sets a floor beneath which rational sellers will not sell: "In an unregulated market, a supplier (record label or copyright owner) will not sell (license) to a service unless the supplier is compensated at or above its walk-away opportunity cost." 83 Fed. Reg. at 65,230.

In the proceedings below, the parties agreed that opportunity cost sets the sellers' price floor. SoundExchange's expert, Professor Robert Willig, explained that "opportunity cost is—is a floor on the applicable royalty rates that [the sellers] should be receiving." J.A. __ (8/6/20 Tr. 683:23-25 (Willig)). NAB's expert, Gregory Leonard, agreed that "[i]f accurately measured, in theory the opportunity cost is the lowest royalty that the licensor would find acceptable." J.A. __ (Leonard CWDT ¶ 99).

Pandora and Sirius XM's expert, Professor Carl Shapiro, likewise agreed that "in a bilateral negotiation between a record company and a service, the record company won't accept a royalty rate that's less than

its opportunity cost of granting a license." J.A. __ (8/20/20 Tr. 3126:23-3127:4 (Shapiro)); *see also* J.A. __ (8/18/20 Tr. 2653:21-2654:4 (Shapiro)); J.A. __ (Shapiro CWDT at 13) ("In a willing-buyer/willing-seller setting, a record company would not license its repertoire to a given music service unless the royalties it receives from that music service are sufficient to compensate that record company for the royalties it loses as a result of the resulting reduction in other forms of listening. A record company's opportunity cost of licensing its repertoire to a given music service is thus the minimum amount that the record company would accept before agreeing to license its repertoire to that music service"); J.A. __ (Shapiro CDWT at 4). Accordingly, Professor Shapiro's bargaining models were expressly designed to result in the record labels receiving "at least [their] opportunity cost." J.A. __ (8/20/20 Tr. 3127:5-8 (Shapiro)).

Thus, while the parties offered differing measures of opportunity cost and calculated different royalty proposals as a result, there was no disagreement about the basic principle that the statutory royalty rate could not be less that the sellers' opportunity cost.

### B.    Determination Below

As relevant to this appeal, the CRB's Determination below set the statutory royalty rate for ad-supported noninteractive services at $0.0021 per performance starting in 2021, with annual adjustments for inflation over the five-year rate period.[3] J.A. __ (slip op. 1). Examples of ad-supported noninteractive services include free-to-the-user services from Google and iHeart, as well as internet simulcasts of AM/FM transmissions by commercial broadcast radio stations.[4]

### 1.    Evidence of Opportunity Cost

Given the CRB's prior decisions and the parties' shared premise that sellers' opportunity cost sets the floor for a statutory rate, computing opportunity cost was a central issue at trial. The CRB ultimately devoted nearly sixty pages in its Determination to evaluating opportunity cost. *See* J.A. __ (slip op. 162-218).

---

[3] For this purpose, a "performance" is the transmission of one recording to one listener. *See* 37 C.F.R. § 380.7. A performance is sometimes also referred to as a "play" or a "stream." All participants in the proceeding below agreed that the statutory royalty rate for ad-supported noninteractive services should be denominated on a per-performance basis, but they disagreed concerning what the per-performance rate should be.

[4] The *Web V* determination set other rates and fees that are not at issue in this appeal.

a.    On behalf of SoundExchange, Professor Willig testified, in relevant part, that record company opportunity cost had two components. He first found that, for each performance by a webcaster, there was an opportunity cost of $0.00273 associated with diversion of listeners from "outside" music products and services (*i.e.*, those not at issue in this proceeding, such as interactive services, satellite radio, physical products, and digital downloads). J.A. __ (Willig CWDT at 23 (Figure 6)). He also found that there was an additional opportunity cost of $0.00011 per performance associated with diversion from subscription noninteractive services, another kind of webcasting service whose rate was set by the CRB. J.A. __ (slip op. 200); J.A. __ (Willig CWDT at 27 (Figure 9) & n.32). He addressed the two components separately because revenue from outside sources was known at the time of his testimony, while revenue from subscription noninteractive services depended on the rates to be set in the proceeding.[5]

---

[5] Because Professor Willig calculated the opportunity cost for diversion from subscription noninteractive services well before the CRB rendered its Determination, he calculated that opportunity cost based on a royalty rate for subscription noninteractive services of $0.00312 per performance as indicated by his economic model. J.A. __ (Willig CWDT at 27 & n.32). The $0.0026 per performance rate for subscription noninteractive services that the CRB ultimately adopted implies a somewhat lower

Thus, in total, Professor Willig found that the opportunity cost of licensing recordings for use on ad-supported non-interactive services was $0.00284 per performance—$0.00273 plus $0.00011. J.A. __ (Willig CWDT at 23 (Figure 6)); J.A. __ (*id.* at 27 (Figure 9)).

Professor Willig calculated opportunity cost as an input to an analysis that attempted to model how these parties would approach a negotiation with one another. That bargaining model, known as a "Shapley value" analysis, considers not only each party's opportunity cost but also how much additional value their agreement would create. The goal of a Shapley value analysis is to consider how the parties to an agreement would divide that surplus value. J.A. __ (Willig CWDT ¶¶ 13, 14); J.A. __ (8/5/20 Tr. 318:21-25, 371:13-17 (Willig)); J.A. __ (8/6/20 Tr. 719:23-25 (Willig)). Each party's "Shapley Value" equals "their average share of the surplus they contribute," plus their opportunity cost (that is, what they would obtain absent any agreement). J.A. __ (slip op. 164). This approach indicates that royalty rates should be set "high enough to at

---

opportunity cost for diversion from subscription noninteractive services than the $0.00011 per performance originally calculated by Professor Willig. However, rather than adjusting for this difference, the CRB ignored this component of opportunity cost altogether.

least allow the record companies to receive . . . their opportunity costs . . . plus their Shapley Values," because any lower and the record companies "would not license their repertoires to the noninteractive services." *Id.*

b.    The Services' experts countered with various adjustments to Professor Willig's opportunity cost analysis. Professor Shapiro testified that Professor Willig's "[o]utside" opportunity cost subtotal of $0.00273 per stream needed to be adjusted downward to $0.00222 per stream. J.A. __ (Shapiro WRT at 50 (Figure 8 n.1)); *see also* J.A. __ (slip op. 200).[6] Professor Shapiro contended that Professor Willig did not properly measure opportunity cost associated with reduced sales of CDs, vinyl records, and digital downloads. Specifically, Professor Shapiro said that Professor Willig derived an incorrect average of the royalties obtained from these three sources because Professor Willig weighted those royalties by retail revenues instead of weighting them by unit sales. By adjusting for that issue, Professor Shapiro derived a reduced weighted average royalty rate for CDs, vinyl, and digital downloads ($1.67) and an

_____

[6] In addition to responding to Professor Willig's Shapley value approach, Professor Shapiro offered two other models to calculate opportunity cost. The CRB rejected these alternatives as "unusable" because they were "based on unreliable data." J.A. __ (slip op. 216-17).

associated reduced opportunity cost ($0.00222 per performance). *Id.*; *see also* J.A. __ (Shapiro WRT at 50 (Figure 8), 82 (Figure D.1)).

Throughout his analysis, Professor Shapiro acknowledged that his figures did not account for the second component of opportunity cost—diversion from subscription noninteractive services to ad-supported noninteractive services. *See* J.A. __ (Shapiro WRT at 50 (Figure 8 n.1)) ("Outside Distributors include all form of music distribution *other than* non-interactive advertising-supported and subscription services."). The Services never disputed Professor Willig's finding that diversion from subscription noninteractive services resulted in an additional opportunity cost of $0.00011 per performance for ad-supported noninteractive services.

c.     At trial, Professor Willig acknowledged that "there was some merit to that point that Professor Shapiro made" about his weighting of the opportunity cost associated with CDs, vinyl, and downloads. J.A. __ (8/5/20 Tr. 504:23-24 (Willig)). However, Professor Willig explained that when he revisited his analysis in light of Professor Shapiro's criticism, Professor Willig discovered a simple but material computational error in Professor Shapiro's weighting by units sold. J.A. __ (8/5/20 Tr. 504:25-

505:6 (Willig)). Specifically, Professor Shapiro miscalculated the total number of consumers because he assumed that all purchasers of CDs, vinyl, and digital downloads were unique individuals, ignoring the reality that some customers purchase multiple formats. *See id.*; *see also* J.A. __ (SoundExchange's Proposed Findings of Fact and Conclusions of Law ¶ 634). In other words, Professor Shapiro's model assumed there were more total users than there actually were, which depressed the per-user royalty. *See* J.A. __ (SoundExchange's Proposed Findings of Fact and Conclusions of Law ¶ 635). After correcting the denominator in Professor Shapiro's calculations, Professor Willig found that the weighted average royalty for CDs, vinyl, and digital downloads increased from $1.67 (Professor Shapiro's calculation) to $2.17 per user per month. J.A. __ (8/5/20 Tr. 504:16-505:6 (Willig)).

The Services did not dispute Professor Willig's adjustment on the merits, and they did not object at trial to his revised calculation of $2.17 per user per month. Their Proposed Findings of Fact contain no rebuttal of the adjustment.

**2.    The CRB Adopted a Misreading of Professor Shapiro's Opportunity Cost Testimony and Did Not Consider Professor Willig's Uncontroverted Corrections**

In its Determination, the CRB purported to adopt Professor Shapiro's opportunity cost analysis, which it characterized as yielding an opportunity cost of $0.00222 per stream. But in doing so, the CRB failed to account for the fact that Professor Shapiro's $0.00222 figure was incomplete because it did not include the additional $0.00011 opportunity cost associated with diversion from subscription noninteractive services. The CRB also declined to consider Professor Willig's corrections to Professor Shapiro's calculations.

a.    After evaluating the Services' experts' arguments, the CRB found that, "[b]ased on the foregoing adjustments accepted by the Judges, Professor Willig's opportunity cost calculation must be adjusted, as set forth [below in Figure 8]." J.A. __ (slip op. 200) (emphasis added). The CRB then set forth a table from Professor Shapiro's written testimony adjusting Professor Willig's opportunity cost *subtotal* before summarizing: "Professor Shapiro's adjustments reduce the opportunity cost for ad-supported services from $0.00273 (Professor Willig's estimate) to $0.00222 (Professor Shapiro's adjusted estimate)." *Id.* As explained

21

above, however, Professor Shapiro's testimony was that the opportunity cost was $0.00222 *plus* the additional opportunity cost associated with diversion from subscription noninteractive services, which Professor Willig calculated to be $0.00011, a figure the Services did not dispute.

b.    In adopting an opportunity cost of $0.00222, the CRB also rejected Professor Willig's testimony that Professor Shapiro's opportunity cost estimate needed to be adjusted upwards. The CRB rejected that testimony not on the merits, but rather because it asserted the testimony was not in the record.

According to the CRB, "Pandora's counsel interposed a prompt objection" to Professor Willig's testimony that the per user opportunity cost was actually $2.17, and "SoundExchange's counsel did not respond." J.A. __ (slip op. 192 n.263). The CRB went on to state that when it "afforded SoundExchange's counsel an opportunity to respond to the objection by Pandora's counsel that had prevented Professor Willig from testifying on this topic before the recess, so that the Judges could decide whether to sustain or overrule the objection raised by Pandora's counsel, . . . SoundExchange's counsel declined to address the objection, claiming (incorrectly) that the testimony that was the subject of the objection 'is

22

already in the record.'" *Id.* (citing 8/5/20 Tr. 504-05; 514-15 (colloquy)). The CRB therefore concluded that "no such testimony regarding an alleged offset as to Professor Shapiro's physical opportunity cost correction (accepted by Professor Willig) is in the record." *Id.*

Contrary to the CRB's account, Professor Willig's testimony was never excluded. After Professor Willig testified to his adjusted $2.17 figure, Pandora's counsel objected that "we're *on the verge* of getting into a new analysis." J.A. (8/5/20 Tr. 504:21-505:18 (Willig)) (emphasis added). To the extent that was an objection to the $2.17 figure at all, the CRB did not rule on the objection, choosing instead to defer the issue. J.A. __ (*Id.* 506:1-10). When the CRB later returned to the question, Pandora's counsel clarified: "I don't object to the testimony that's been elicited. I think my objection was that I felt [Professor Willig was] going to get into more objectionable testimony." J.A. __ (*Id.* 515:14-17). Reiterating, he said "if they're prepared to move on, I don't have a standing objection." J.A. __ (*Id.* 515:18-19). Accordingly, Professor Willig's testimony concerning the revised opportunity cost associated with switching to CDs, vinyl, and digital downloads was in the record of the proceeding below.

23

### 3. The CRB Adopted a Rate Below Opportunity Cost

Having adopted what it mischaracterized as Professor Shapiro's finding that the relevant opportunity cost was $0.00222 per stream, the CRB then set the rate for ad-supported noninteractive services at $0.0021, which was less than the opportunity cost it found. The CRB did not acknowledge or address this discrepancy.

a. The CRB conducted an analysis of the competing benchmark analyses proposed by Mr. Jon Orszag, Professor Shapiro, and Dr. Steven Peterson—SoundExchange's, Pandora's, and Google's experts, respectively. The CRB chose among the experts' dueling proposed upward and downward adjustments to establish a framework, which the CRB applied to each experts' analysis to calculate judge-modified benchmark rates for the ad-supported market:

- Mr. Orszag (SoundExchange): $0.0023 per performance. J.A. __ (slip op. 149).

- Professor Shapiro (Pandora): $0.0023 per performance. J.A. __ (slip op. 147).

- Dr. Peterson (Google): $0.0021 per performance. J.A. __ (slip op. 159-60).

24

Following this exercise, the CRB spent nearly 150 pages of its Determination addressing Professor Willig's Shapley approach and a half dozen other topics before returning to the ultimate question of rates and abruptly concluding that Dr. Peterson's adjusted benchmarking analysis yielding a rate of $0.0021 per play best satisfied the willing buyer/willing seller standard. J.A. __ (slip op. 301).

b.     The CRB did not address (or even seem to recognize) the fact that the royalty rate it selected based on Dr. Peterson's analysis was below the partial opportunity cost calculation from Professor Shapiro that it adopted much earlier in its determination. Instead, it discussed Professor Willig's Shapley analysis. Professor Willig's Shapley model yielded a royalty rate of $0.00297. J.A. __ (Willig CWDT at 27 (Figure 9)). But, earlier, the CRB had found that Professor Willig's Shapley model should be adjusted to yield a royalty rate below $0.0023. J.A. __ (slip op. 202-03). After finding that Dr. Peterson's adjusted benchmark of $0.0021 was more persuasive than Mr. Orszag and Professor Shapiro's adjusted benchmarks of $0.0023, the CRB noted "that this conclusion is also supported by the limited guideposts yielded by Professor Willig's Shapley Model-derived rates, as adjusted by the [CRB], which indicate that

25

effectively competitive rates would be less than $0.0023 for ad-supported services."[7] J.A. __ (slip op. 301).

c.    The consequences of setting a royalty rate at $0.0021 rather than $0.00222 per performance are significant. In 2021, the first year of the term covered by the Determination, SoundExchange collected nearly $100 million in royalties for performances on ad-supported services at the $0.0021 rate adopted by the CRB. If that rate were increased to $0.00222, those one-year royalties would be increased by almost $6 million. Over the course of a five-year term, the lost royalties are nearly $30 million. Increasing the royalty rate to $0.00233 per performance would have a further similar effect.

## SUMMARY OF ARGUMENT

I.    The CRB irrationally concluded that copyright owners and artists would willingly license their recordings to ad-supported noninteractive services for $0.0021 per performance, even though they would lose $0.00222 per performance from other sources by doing so.

---

[7] To be clear, Professor Willig's Shapley Model is not his estimate of opportunity cost. The latter ($0.00284) is an input to the former, which yielded a proposed rate of $0.00297. J.A. __ (Willig CWDT at 27 (Figure 9)).

That was error. By law, the CRB was required to set a rate that a willing seller would accept. The CRB recognized in previous proceedings, and the parties agreed in this proceeding, that a willing seller would not sell at a price below its opportunity cost, and hence that a rate below opportunity cost would not satisfy the willing buyer/willing seller standard set forth in the Copyright Act. The CRB violated that statutory standard when it set a rate below opportunity cost and, in doing so, cost copyright owners and artists tens of millions of dollars in lost royalties over the rate period. Although there could be no rational explanation for the CRB's ruling, the CRB did not even purport to provide a reason for the discrepancy. The decision was therefore arbitrary and capricious as well as contrary to law.

**II.** The CRB further erred in calculating the opportunity cost itself. It purported to adopt Professor Shapiro's estimate of opportunity cost, which it interpreted to be $0.00222. But that was not Professor Shapiro's testimony. As the very table reproduced in the CRB's Determination makes clear, Professor Shapiro's $0.00222 estimate was exclusive of additional opportunity cost due to diversion from subscription noninteractive services. Professor Willig's uncontroverted

27

testimony was that such additional opportunity cost added $0.00011 per performance to Professor Shapiro's estimate. The CRB acted arbitrarily and capriciously when it misstated Professor Shapiro's estimate. The CRB further erred when it refused to consider Professor Willig's upward adjustment to a component of the opportunity cost analysis it adopted. The CRB rejected that adjustment—which was not substantively disputed by the Services—solely on the mistaken ground that it was not part of the record. However, the record is clear that, to the extent any objection was lodged, it was never ruled upon and was ultimately withdrawn. The CRB acted arbitrarily and capriciously when it refused to consider Professor Willig's adjustment.

## STANDING

SoundExchange participated in the proceeding below, is bound by it, and is authorized to collect and distribute royalties under the Section 114 and 112 statutory licenses, including to its copyright-owner and recording-artist members. The Determination under review set those royalties at an unlawful and arbitrarily low rate that will cause injury to copyright owners and artists. SoundExchange thus has standing to seek

review of the Order on its own behalf and on behalf of its members. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

## ARGUMENT

## I.    The CRB's Decision to Set the Statutory Royalty Rate for Ad-Supported Noninteractive Services Below Opportunity Cost Was Contrary to Law and Arbitrary and Capricious

The parties presented substantial opportunity cost evidence at trial, and the CRB devoted more than 60 pages of its Determination to the issue. *See generally* J.A. __ (slip op. 162-218). Although the parties disputed what the opportunity cost *was*, they agreed about what the opportunity cost *meant*: no willing seller would sell below its opportunity cost. *See* J.A. __ (8/6/20 Tr. 683:23-25 (Willig)); J.A. __ (8/20/20 Tr. 3126:23-3127:8 (Shapiro)).

The parties further agreed about what opportunity cost means in the real world: it measures the extent to which licensing sound recordings for performance by ad-supported noninteractive webcasters will reduce revenues from other sources, such as on-demand services, satellite radio, CDs, vinyl, digital downloads, and subscription noninteractive services. The parties' focus on opportunity cost reflected the CRB's prior repeated

determination that a willing seller would not sell below its opportunity cost, a conclusion the CRB did not question in the current proceeding.

Notwithstanding past practice, current consensus, and its extended discussion of opportunity cost, the CRB set the rate for ad-supported noninteractive services *below* the opportunity cost it found. J.A. __ (slip op. 301). In other words, the CRB simultaneously concluded that copyright owners and artists would forfeit $0.00222 per performance from other sources by licensing to ad-supported noninteractive services, and yet would willingly license their recordings to those services for $0.0021 per performance. The CRB did so without acknowledging this discrepancy, let alone explaining it (although there could be no rational explanation for such a conclusion). This failure renders the CRB's rate unlawful, and arbitrary and capricious.

## A. Agencies Must Comply with the Law and Give Reasons for Their Decisions

Twin pillars govern agency decision-making: an agency must act consistent with governing law, and its decision-making must be rational and supported by reasons identified in the record. 5 U.S.C. § 706; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). With respect to the law, the agency is bound to

30

follow Congress's clear instructions and to adopt a reasonable interpretation of any ambiguous statute. *See City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018).

Even where an agency has discretion to act under a statute, it must give valid reasons for its decision. This includes "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). A decision is arbitrary and capricious if it "runs counter to the evidence before the agency," *Growth Energy v. EPA*, 5 F.4th 1, 31 (D.C. Cir. 2021), or if it "ignore[s] . . . factual findings that contradict [the agency's] new policy," *National Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019). Put simply, "[t]he requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result." *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993).

In addition to being obliged to comply with these general precepts of administrative law, the CRB is also required to rule consistent with "prior determinations and interpretations of the Copyright Royalty Tribunal, Librarian of Congress, the Register of Copyrights, copyright

arbitration royalty panels . . . Copyright Royalty Judges . . . under this chapter, and decisions of the court of appeals under this chapter." 17 U.S.C. § 803(a)(1). "The Judges are free to depart from precedent if they provide reasoned explanations for their departures." *Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 762; *see also Music Choice v. Copyright Royalty Bd.*, 774 F.3d 1000, 1013 (D.C. Cir. 2014). But they may not *sub silentio* depart from their prior decisions.

## B.    The CRB Acted Unlawfully by Setting a Rate Below Opportunity Cost

Having found that copyright owners and artists would be forgoing revenues of $0.00222 per performance from other sources by licensing their music to ad-supported noninteractive services, it was error for the CRB to hold that a willing seller would agree to license its recordings for a royalty of $0.0021 per performance (*i.e.*, less than the amount that they would forgo).

**1.**    As an initial matter, it is clear that this is what the CRB did. After reviewing the trial record on opportunity cost over the course of nearly 60 pages of its Determination, the CRB expressly adopted Professor Shapiro's recalculation of Professor Willig's opportunity cost subtotal. The CRB concluded that "[b]ased on the foregoing adjustments

32

*accepted by the Judges*, Professor Willig's opportunity cost calculation must be adjusted. . . . Professor Shapiro's adjustments reduce the opportunity cost for ad-supported services from $0.00273 (Professor Willig's estimate) to $0.00222 (Professor Shapiro's adjusted estimate)." J.A. __ (slip op. 200) (emphasis added). Nonetheless, after considering various benchmarking analyses, the CRB chose to credit Dr. Peterson's, setting a rate of $0.0021 per performance. J.A. __ (slip op. 301).

2.    That determination was unlawful. ***First***, it cannot be reconciled with the governing statute requiring the CRB to set a rate that best approximates what a "willing seller" would accept. As this Court has explained, that standard requires the CRB to adopt a rate that "would have been negotiated in the marketplace between a willing buyer and a willing seller." *Intercollegiate Broad. Sys., Inc.*, 574 F.3d at 757 (quoting what is now 17 U.S.C. § 114(f)(1)(B)). After all, no willing seller would give up *more* to get *less*. Yet that is precisely what the CRB decreed when it found that the opportunity cost of licensing to ad-supported noninteractive services is $0.00222 yet set a statutory royalty rate of $0.0021. In effect, the CRB imposed a rate that, by its own calculations, does not allow copyright owners and artists to recover revenues lost

because of the statutory license. That does not satisfy the willing buyer/willing seller standard.

The CRB has previously recognized that a willing seller would not sell below its opportunity cost. S*ee SDARS III*, 83 Fed. Reg. at 65,230; *Web IV*, 81 Fed. Reg. at 26,366. And the CRB reiterated in the decision below that opportunity cost measures what the copyright owners and artists would be giving up by licensing to noninteractive webcasters: "The opportunity cost of anything of value is what you must give up to get it." J.A. __ (slip op. 164 n.220) (quoting John Quiggin, *Economics in Two Lessons: Why Markets Work So Well, and Why They Can Fail So Badly* 15 (2019)). The parties here explicitly agreed that opportunity cost sets a floor for the statutory royalty rate. *See* J.A. __ (8/6/20 Tr. 683:23-25 (Willig)); J.A. __ (8/20/20 Tr. 3126:23-3127:8 (Shapiro)).

To be sure, the CRB is also required to set a rate that a willing buyer would accept. 17 U.S.C. § 114(f)(1)(B). But the requirement to set a rate satisfactory to a willing seller is independent of that obligation. *See Intercollegiate Broad. Sys., Inc.*, 796 F.3d at 128 ("[T]he Board must set a fee that both a willing buyer *and* a willing seller would negotiate, not just one that is acceptable to the buyer . . . ."). If the rate is not one a

34

willing seller would negotiate and accept for itself, then the rate is not one that satisfies the governing statute. *See id.*; *see also id.* at 130 (noting that it was reasonable to conclude that no "willing seller would agree to a price that is substantially below its administrative costs" (quoting *Web III*, 79 Fed. Reg. at 23,123)); *cf. SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 56 (D.C. Cir. 2018) (noting that sellers cannot "be said to be 'willing' partners to an agreement if they are coerced to agree to a price" (quotation marks omitted)). Setting a rate so low that a seller would receive less than it gives up is just such a coercive price. The CRB's rate determination was therefore contrary to law.

**Second**, even if the CRB had flexibility to set a rate below opportunity cost—and it did not—the CRB's decision to set the rate at $0.0021 per performance was arbitrary and capricious, because the CRB not only chose a number below the opportunity cost it adopted, but it also did so without any explanation for that departure from precedent and the contrary record evidence. J.A. __ (slip op. 301).

The CRB is not entitled to make a decision without providing a rational explanation. The CRB had previously recognized that opportunity cost sets the floor for what a willing seller would accept. The

parties' experts agreed with that principle. Yet the CRB, without explanation, departed from that past practice and evidence, and set the royalty rate below the opportunity cost figure it adopted.

The CRB thus failed to articulate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted). That omission was particularly problematic because it represented an unacknowledged change in course from the CRB's prior determinations. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). This Court has repeatedly reversed agency decisions that mark an unexplained—let alone an unacknowledged— departure from prior practice. *See, e.g.*, *Nat'l Lifeline Ass'n*, 921 F.3d at 1111-12 (faulting FCC for failing to "acknowledge [its] policy reversal" or "provid[e] any reasoned explanation for its reversal"); *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 646 (D.C. Cir. 2020) (vague references to prior policy "might have been sufficient to *acknowledge* EPA's change in policy," but "failed to 'provide a reasoned explanation for the change'" (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)).

In short, the rate chosen by the CRB does not rationally relate to the evidence before it, contradicts prior decisions, and is supported by no

reasoning. It is therefore arbitrary and capricious. *See* 5 U.S.C. § 706. This Court should, at minimum, reverse and remand with instructions to set the rate no lower than $0.00233 per performance.

## II.  It Was Legal Error for the CRB to Ignore Record Evidence That Opportunity Cost Was Higher Than It Found

Not only did the CRB fail to set a rate at least equal to opportunity cost, it also arbitrarily failed to consider record evidence that the opportunity cost was higher than the analysis it adopted. The CRB's error in concluding that $0.00222 was the relevant opportunity cost was twofold.

1.   ***First***, the CRB purported to rely on Professor Shapiro's testimony to find an opportunity cost for ad-supported noninteractive services of $0.00222. But Professor Shapiro did *not* find that the relevant opportunity cost was $0.00222. As shown in the very table from Professor Shapiro's written testimony that the CRB adopted in its Determination, Professor Shapiro's testimony was that the opportunity cost for ad-supported noninteractive services was $0.00222 *plus* an additional amount associated with diversion from the subscription noninteractive services for which rates were also to be set in the proceeding below. *See* J.A. __ (slip op. at 200) (adopting Figure 8 from Shapiro's written rebuttal

testimony, including note 1 thereto); *see also* J.A. __ (Shapiro WRT at 50) (acknowledging the subtotal opportunity cost figures reflected "Outside Distributors" only).

The CRB failed to note or take into account that aspect of Professor Shapiro's testimony. The unrebutted record testimony was that such diversion added $0.00011 to the opportunity cost total,[8] meaning that Professor Shapiro's complete estimate yielded an opportunity cost of $0.00233, not $0.00222—a difference of millions of dollars of royalties for the hundreds of billions of streams at issue over the license term. It was arbitrary and capricious for the CRB to find that total opportunity cost was $0.00222 when the expert it relied upon for that figure acknowledged that total opportunity cost was actually higher.

**2.** ***Second***, the CRB failed to consider other unrebutted testimony that Professor Shapiro's opportunity cost estimate contained an obvious computational flaw and needed to be adjusted upward. Professor Willig testified without contradiction that Professor Shapiro

---

[8] *Compare* J.A. __ (Willig CWDT at 23, Fig. 6) (calculating the opportunity cost *subtotal* for *outside distributors* as $0.00273), *with* J.A. __ (Willig CWDT at 27, Fig. 9) (calculating the opportunity cost *total* for *all distributors* as $0.00284); *see also* Willig CDWT at 27 n.32 (explaining the difference between these figures).

had understated the extent to which rightsholders would lose royalties from CDs, vinyl, and digital downloads. J.A. __ (8/5/20 Tr. 503:21-504:8 (Willig)). *See supra* 18-19.

The CRB rejected this testimony not on the merits, but solely on the ground that the testimony supposedly had been excluded from the record. J.A. __ (slip op. 192 n.263) (finding that Pandora's counsel "prevented Professor Willig from testifying on this topic before the recess" by raising an objection and therefore that no "testimony regarding an alleged offset as to Professor Shapiro's physical opportunity cost correction . . . is in the record.").

But Professor Willig's testimony was admitted. After Professor Willig described his proposed adjustment, Pandora's counsel lodged *a prospective* objection to the *continuation* of Professor Willig's testimony because, he stated, it was "*on the verge* of getting into a new analysis that was conducted after the submission of [Professor Willig's] written rebuttal testimony, and . . . that's out of bounds." J.A. __ (8/5/20 Tr. 503:14-505:18 (Willig)) (emphasis added). Pandora's counsel thus was at most seeking to preclude further testimony about Professor Willig's

adjustment, not asking to strike the testimony that had already been given.

In any event, the CRB never ruled on the objection, and Pandora's counsel then affirmatively withdrew it, stating: "I don't object to the testimony that's been elicited. I think my objection was that I felt we were going to get into more objectionable testimony." J.A. __ (8/5/20 Tr. 515:14-17 (Willig)). Professor Willig's discussion of the upward adjustment clearly *was* in the record. It was arbitrary and capricious for the CRB to fail to consider relevant evidence on the mistaken ground it had not been admitted. And had that evidence—which the Services did not dispute on the merits—been considered, it would have yielded a still higher opportunity cost, and thus correspondingly set a higher floor for the relevant statutory rate.

3.    These errors require vacatur of the Determination's rate for ad-supported noninteractive services. A fundamental requirement of administrative law is that an administrative body must consider all relevant evidence before it. Stated in the opposite: an administrative decision cannot "withstand review [if] the agency decisionmaker entirely ignored relevant evidence." *Morall v. DEA.*, 412 F.3d 165, 178 (D.C. Cir.

2005); *see also El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1278 (D.C. Cir. 2005) (agency action was arbitrary and capricious where it failed to address relevant evidence); *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 214-15 (D.C. Cir. 1994). Thus, it was arbitrary and capricious for the CRB to adopt Professor Shapiro's opportunity cost calculation without considering record evidence that the number should be higher.

Because the CRB refused to consider relevant and uncontested record evidence, this Court should vacate the Determination in relevant part and remand with instructions to the CRB to set a rate for ad-supported noninteractive services at least equal to opportunity cost, taking account of the additional opportunity cost due to lost revenue associated with subscription noninteractive services and the adjustment testimony from Professor Willig.

## CONCLUSION

For the foregoing reasons, the decision of the CRB should be vacated in relevant part and the matter remanded for further consideration.

Dated: July 27, 2022

Respectfully submitted,

/s/ Matthew S. Hellman
Matthew S. Hellman
Eric E. Petry
Victoria Hall-Palerm
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
MHellman@jenner.com

*Counsel for SoundExchange, Inc.*

TIM DADSON
General Counsel
BRAD PRENDERGAST
Assistant General Counsel
SoundExchange, Inc.
733 10th Street, N.W.
10th Floor
Washington, D.C. 20001
Tel: (202) 640-5858

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,033 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font for the main text and 14-point Century Schoolbook font for footnotes.

July 27, 2022                                    /s/ Matthew S. Hellman
                                                Matthew S. Hellman

43

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of July, 2022, I caused to be electronically filed the foregoing **Opening Brief of Petitioner SoundExchange, Inc.** with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

July 27, 2022                                    /s/ Matthew S. Hellman
                                                 Matthew S. Hellman

**STATUTORY ADDENDUM**

## INDEX

5 U.S.C. § 706 ...................................................................................... S.A.-1

17 U.S.C. § 106 .................................................................................... S.A.-2

17 U.S.C. § 112(e) ............................................................................... S.A.-2

17 U.S.C. § 112(e)(3) ........................................................................... S.A.-3

17 U.S.C. § 114(d)(2) ........................................................................... S.A.-6

17 U.S.C. § 114(f) ............................................................................... S.A.-11

17 U.S.C. § 114(j)(6)-(8) ..................................................................... S.A.-16

17 U.S.C. § 801 .................................................................................... S.A.-17

17 U.S.C. § 803(a)(1) ........................................................................... S.A.-23

17 U.S.C. § 803(d)(1) ........................................................................... S.A.-23

17 U.S.C. § 804(b)(3)(A) ...................................................................... S.A.-24

37 C.F.R. § 380.7 ................................................................................. S.A.-25

**5 U.S.C. § 706**

§ 706 Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 17 U.S.C. § 106

§ 106 Exclusive rights in copyrighted works

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.


## 17 U.S.C. § 112

§ 112 Limitations on exclusive rights: Ephemeral recordings

****

(e) Statutory license.--(1) A transmitting organization entitled to transmit to the public a performance of a sound recording under the limitation on exclusive rights specified by section 114(d)(1)(C)(iv) or under a statutory license in accordance with section 114(f) is entitled to a statutory license, under the conditions specified by this subsection, to make no more than 1 phonorecord of the sound recording (unless the

terms and conditions of the statutory license allow for more), if the following conditions are satisfied:

(A) The phonorecord is retained and used solely by the transmitting organization that made it, and no further phonorecords are reproduced from it.

(B) The phonorecord is used solely for the transmitting organization's own transmissions originating in the United States under a statutory license in accordance with section 114(f) or the limitation on exclusive rights specified by section 114(d)(1)(C)(iv).

(C) Unless preserved exclusively for purposes of archival preservation, the phonorecord is destroyed within 6 months from the date the sound recording was first transmitted to the public using the phonorecord.

(D) Phonorecords of the sound recording have been distributed to the public under the authority of the copyright owner or the copyright owner authorizes the transmitting entity to transmit the sound recording, and the transmitting entity makes the phonorecord under this subsection from a phonorecord lawfully made and acquired under the authority of the copyright owner.

(2) Notwithstanding any provision of the antitrust laws, any copyright owners of sound recordings and any transmitting organizations entitled to a statutory license under this subsection may negotiate and agree upon royalty rates and license terms and conditions for making phonorecords of such sound recordings under this section and the proportionate division of fees paid among copyright owners, and may designate common agents to negotiate, agree to, pay, or receive such royalty payments.

(3) Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for the activities specified by paragraph (1) during the 5-year period beginning on January 1 of the second year following the year in which the proceedings are to be commenced, or such other period as the parties may agree. Such rates shall include a minimum fee for each type of service offered by transmitting organizations. Any copyright owners of sound recordings or any

transmitting organizations entitled to a statutory license under this subsection may submit to the Copyright Royalty Judges licenses covering such activities with respect to such sound recordings. The parties to each proceeding shall bear their own costs.

(4) The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to paragraph (5), be binding on all copyright owners of sound recordings and transmitting organizations entitled to a statutory license under this subsection during the 5-year period specified in paragraph (3), or such other period as the parties may agree. Such rates shall include a minimum fee for each type of service offered by transmitting organizations. The Copyright Royalty Judges shall establish rates that most clearly represent the fees that would have been negotiated in the marketplace between a willing buyer and a willing seller. In determining such rates and terms, the Copyright Royalty Judges shall base their decision on economic, competitive, and programming information presented by the parties, including--

> (A) whether use of the service may substitute for or may promote the sales of phonorecords or otherwise interferes with or enhances the copyright owner's traditional streams of revenue; and

> (B) the relative roles of the copyright owner and the transmitting organization in the copyrighted work and the service made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, and risk.

In establishing such rates and terms, the Copyright Royalty Judges may consider the rates and terms under voluntary license agreements described in paragraphs (2) and (3). The Copyright Royalty Judges shall also establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings under this section, and under which records of such use shall be kept and made available by transmitting organizations entitled to obtain a statutory license under this subsection.

(5) License agreements voluntarily negotiated at any time between 1 or more copyright owners of sound recordings and 1 or more

transmitting organizations entitled to obtain a statutory license under this subsection shall be given effect in lieu of any decision by the Librarian of Congress or determination by the Copyright Royalty Judges.

(6)(A) Any person who wishes to make a phonorecord of a sound recording under a statutory license in accordance with this subsection may do so without infringing the exclusive right of the copyright owner of the sound recording under section 106(1)--

> (i) by complying with such notice requirements as the Copyright Royalty Judges shall prescribe by regulation and by paying royalty fees in accordance with this subsection; or

> (ii) if such royalty fees have not been set, by agreeing to pay such royalty fees as shall be determined in accordance with this subsection.

> (B) Any royalty payments in arrears shall be made on or before the 20th day of the month next succeeding the month in which the royalty fees are set.

(7) If a transmitting organization entitled to make a phonorecord under this subsection is prevented from making such phonorecord by reason of the application by the copyright owner of technical measures that prevent the reproduction of the sound recording, the copyright owner shall make available to the transmitting organization the necessary means for permitting the making of such phonorecord as permitted under this subsection, if it is technologically feasible and economically reasonable for the copyright owner to do so. If the copyright owner fails to do so in a timely manner in light of the transmitting organization's reasonable business requirements, the transmitting organization shall not be liable for a violation of section 1201(a)(1) of this title for engaging in such activities as are necessary to make such phonorecords as permitted under this subsection.

(8) Nothing in this subsection annuls, limits, impairs, or otherwise affects in any way the existence or value of any of the exclusive rights of the copyright owners in a sound recording, except as otherwise provided in this subsection, or in a musical work, including the

exclusive rights to reproduce and distribute a sound recording or musical work, including by means of a digital phonorecord delivery, under sections 106(1), 106(3), and 115, and the right to perform publicly a sound recording or musical work, including by means of a digital audio transmission, under sections 106(4) and 106(6).

****

## 17 U.S.C. § 114

§ 114 Scope of exclusive rights in sound recordings

****

(d) Limitations on exclusive right.--Notwithstanding the provisions of section 106(6)--

****

(2) Statutory licensing of certain transmissions.--The performance of a sound recording publicly by means of a subscription digital audio transmission not exempt under paragraph (1), an eligible nonsubscription transmission, or a transmission not exempt under paragraph (1) that is made by a preexisting satellite digital audio radio service shall be subject to statutory licensing, in accordance with subsection (f) if--

(A)(i) the transmission is not part of an interactive service;

(ii) except in the case of a transmission to a business establishment, the transmitting entity does not automatically and intentionally cause any device receiving the transmission to switch from one program channel to another; and

(iii) except as provided in section 1002(e), the transmission of the sound recording is accompanied, if technically feasible, by the information encoded in that sound recording, if any, by or under the authority of the copyright owner of that sound recording, that identifies the title of the sound recording, the featured

S.A.-6

recording artist who performs on the sound recording, and related information, including information concerning the underlying musical work and its writer;

(B) in the case of a subscription transmission not exempt under paragraph (1) that is made by a preexisting subscription service in the same transmission medium used by such service on July 31, 1998, or in the case of a transmission not exempt under paragraph (1) that is made by a preexisting satellite digital audio radio service--

(i) the transmission does not exceed the sound recording performance complement; and

(ii) the transmitting entity does not cause to be published by means of an advance program schedule or prior announcement the titles of the specific sound recordings or phonorecords embodying such sound recordings to be transmitted; and

(C) in the case of an eligible nonsubscription transmission or a subscription transmission not exempt under paragraph (1) that is made by a new subscription service or by a preexisting subscription service other than in the same transmission medium used by such service on July 31, 1998--

(i) the transmission does not exceed the sound recording performance complement, except that this requirement shall not apply in the case of a retransmission of a broadcast transmission if the retransmission is made by a transmitting entity that does not have the right or ability to control the programming of the broadcast station making the broadcast transmission, unless--

(I) the broadcast station makes broadcast transmissions--

(aa) in digital format that regularly exceed the sound recording performance complement; or

(bb) in analog format, a substantial portion of which, on a weekly basis, exceed the sound recording performance complement; and

(II) the sound recording copyright owner or its representative has notified the transmitting entity in writing that broadcast transmissions of the copyright owner's sound recordings exceed the sound recording performance complement as provided in this clause;

(ii) the transmitting entity does not cause to be published, or induce or facilitate the publication, by means of an advance program schedule or prior announcement, the titles of the specific sound recordings to be transmitted, the phonorecords embodying such sound recordings, or, other than for illustrative purposes, the names of the featured recording artists, except that this clause does not disqualify a transmitting entity that makes a prior announcement that a particular artist will be featured within an unspecified future time period, and in the case of a retransmission of a broadcast transmission by a transmitting entity that does not have the right or ability to control the programming of the broadcast transmission, the requirement of this clause shall not apply to a prior oral announcement by the broadcast station, or to an advance program schedule published, induced, or facilitated by the broadcast station, if the transmitting entity does not have actual knowledge and has not received written notice from the copyright owner or its representative that the broadcast station publishes or induces or facilitates the publication of such advance program schedule, or if such advance program schedule is a schedule of classical music programming published by the broadcast station in the same manner as published by that broadcast station on or before September 30, 1998;

(iii) the transmission--

(I) is not part of an archived program of less than 5 hours duration;

(II) is not part of an archived program of 5 hours or greater in duration that is made available for a period exceeding 2 weeks;

(III) is not part of a continuous program which is of less than 3 hours duration; or

(IV) is not part of an identifiable program in which performances of sound recordings are rendered in a predetermined order, other than an archived or continuous program, that is transmitted at--

(aa) more than 3 times in any 2-week period that have been publicly announced in advance, in the case of a program of less than 1 hour in duration, or

(bb) more than 4 times in any 2-week period that have been publicly announced in advance, in the case of a program of 1 hour or more in duration,

except that the requirement of this subclause shall not apply in the case of a retransmission of a broadcast transmission by a transmitting entity that does not have the right or ability to control the programming of the broadcast transmission, unless the transmitting entity is given notice in writing by the copyright owner of the sound recording that the broadcast station makes broadcast transmissions that regularly violate such requirement;

(iv) the transmitting entity does not knowingly perform the sound recording, as part of a service that offers transmissions of visual images contemporaneously with transmissions of sound recordings, in a manner that is likely to cause confusion, to cause mistake, or to deceive, as to the affiliation, connection, or association of the copyright owner or featured recording artist with the transmitting entity or a particular product or service advertised by the transmitting entity, or as to the origin, sponsorship, or approval by the copyright owner or featured recording artist of the activities of the transmitting entity other than the performance of the sound recording itself;

(v) the transmitting entity cooperates to prevent, to the extent feasible without imposing substantial costs or burdens, a transmission recipient or any other person or entity from

S.A.-9

automatically scanning the transmitting entity's transmissions alone or together with transmissions by other transmitting entities in order to select a particular sound recording to be transmitted to the transmission recipient, except that the requirement of this clause shall not apply to a satellite digital audio service that is in operation, or that is licensed by the Federal Communications Commission, on or before July 31, 1998;

(vi) the transmitting entity takes no affirmative steps to cause or induce the making of a phonorecord by the transmission recipient, and if the technology used by the transmitting entity enables the transmitting entity to limit the making by the transmission recipient of phonorecords of the transmission directly in a digital format, the transmitting entity sets such technology to limit such making of phonorecords to the extent permitted by such technology;

(vii) phonorecords of the sound recording have been distributed to the public under the authority of the copyright owner or the copyright owner authorizes the transmitting entity to transmit the sound recording, and the transmitting entity makes the transmission from a phonorecord lawfully made under the authority of the copyright owner, except that the requirement of this clause shall not apply to a retransmission of a broadcast transmission by a transmitting entity that does not have the right or ability to control the programming of the broadcast transmission, unless the transmitting entity is given notice in writing by the copyright owner of the sound recording that the broadcast station makes broadcast transmissions that regularly violate such requirement;

(viii) the transmitting entity accommodates and does not interfere with the transmission of technical measures that are widely used by sound recording copyright owners to identify or protect copyrighted works, and that are technically feasible of being transmitted by the transmitting entity without imposing substantial costs on the transmitting entity or resulting in perceptible aural or visual degradation of the digital signal,

except that the requirement of this clause shall not apply to a satellite digital audio service that is in operation, or that is licensed under the authority of the Federal Communications Commission, on or before July 31, 1998, to the extent that such service has designed, developed, or made commitments to procure equipment or technology that is not compatible with such technical measures before such technical measures are widely adopted by sound recording copyright owners; and

(ix) the transmitting entity identifies in textual data the sound recording during, but not before, the time it is performed, including the title of the sound recording, the title of the phonorecord embodying such sound recording, if any, and the featured recording artist, in a manner to permit it to be displayed to the transmission recipient by the device or technology intended for receiving the service provided by the transmitting entity, except that the obligation in this clause shall not take effect until 1 year after the date of the enactment of the Digital Millennium Copyright Act and shall not apply in the case of a retransmission of a broadcast transmission by a transmitting entity that does not have the right or ability to control the programming of the broadcast transmission, or in the case in which devices or technology intended for receiving the service provided by the transmitting entity that have the capability to display such textual data are not common in the marketplace.

**\*\*\*\***

(f) Licenses for certain nonexempt transmissions.--

(1)(A) Proceedings under chapter 8 shall determine reasonable rates and terms of royalty payments for transmissions subject to statutory licensing under subsection (d)(2) during the 5-year period beginning on January 1 of the second year following the year in which the proceedings are to be commenced pursuant to subparagraph (A) or (B) of section 804(b)(3), as the case may be, or such other period as the parties may agree. The parties to each proceeding shall bear their own costs.

(B) The schedule of reasonable rates and terms determined by the Copyright Royalty Judges shall, subject to paragraph (2), be binding on all copyright owners of sound recordings and entities performing sound recordings affected by this paragraph during the 5-year period specified in subparagraph (A), or such other period as the parties may agree. Such rates and terms shall distinguish among the different types of services then in operation and shall include a minimum fee for each such type of service, such differences to be based on criteria including the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers. The Copyright Royalty Judges shall establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller. In determining such rates and terms, the Copyright Royalty Judges--

(i) shall base their decision on economic, competitive, and programming information presented by the parties, including--

(I) whether use of the service may substitute for or may promote the sales of phonorecords or otherwise may interfere with or may enhance the sound recording copyright owner's other streams of revenue from the copyright owner's sound recordings; and

(II) the relative roles of the copyright owner and the transmitting entity in the copyrighted work and the service made available to the public with respect to relative creative contribution, technological contribution, capital investment, cost, and risk; and

(ii) may consider the rates and terms for comparable types of audio transmission services and comparable circumstances under voluntary license agreements.

(C) The procedures under subparagraphs (A) and (B) shall also be initiated pursuant to a petition filed by any sound recording copyright owner or any transmitting entity indicating that a new

type of service on which sound recordings are performed is or is about to become operational, for the purpose of determining reasonable terms and rates of royalty payments with respect to such new type of service for the period beginning with the inception of such new type of service and ending on the date on which the royalty rates and terms for eligible nonsubscription services and new subscription services, or preexisting subscription services and preexisting satellite digital audio radio services, as the case may be, most recently determined under subparagraph (A) or (B) and chapter 8 expire, or such other period as the parties may agree.

(2) License agreements voluntarily negotiated at any time between 1 or more copyright owners of sound recordings and 1 or more entities performing sound recordings shall be given effect in lieu of any decision by the Librarian of Congress or determination by the Copyright Royalty Judges.

(3)(A) The Copyright Royalty Judges shall also establish requirements by which copyright owners may receive reasonable notice of the use of their sound recordings under this section, and under which records of such use shall be kept and made available by entities performing sound recordings. The notice and recordkeeping rules in effect on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004 shall remain in effect unless and until new regulations are promulgated by the Copyright Royalty Judges. If new regulations are promulgated under this subparagraph, the Copyright Royalty Judges shall take into account the substance and effect of the rules in effect on the day before the effective date of the Copyright Royalty and Distribution Reform Act of 2004 and shall, to the extent practicable, avoid significant disruption of the functions of any designated agent authorized to collect and distribute royalty fees.

(B) Any person who wishes to perform a sound recording publicly by means of a transmission eligible for statutory licensing under this subsection may do so without infringing the exclusive right of the copyright owner of the sound recording--

(i) by complying with such notice requirements as the Copyright Royalty Judges shall prescribe by regulation and by paying royalty fees in accordance with this subsection; or

(ii) if such royalty fees have not been set, by agreeing to pay such royalty fees as shall be determined in accordance with this subsection.

(C) Any royalty payments in arrears shall be made on or before the twentieth day of the month next succeeding the month in which the royalty fees are set.

(4)(A) Notwithstanding section 112(e) and the other provisions of this subsection, the receiving agent may enter into agreements for the reproduction and performance of sound recordings under section 112(e) and this section by any 1 or more commercial webcasters or noncommercial webcasters for a period of not more than 11 years beginning on January 1, 2005, that, once published in the Federal Register pursuant to subparagraph (B), shall be binding on all copyright owners of sound recordings and other persons entitled to payment under this section, in lieu of any determination by the Copyright Royalty Judges. Any such agreement for commercial webcasters may include provisions for payment of royalties on the basis of a percentage of revenue or expenses, or both, and include a minimum fee. Any such agreement may include other terms and conditions, including requirements by which copyright owners may receive notice of the use of their sound recordings and under which records of such use shall be kept and made available by commercial webcasters or noncommercial webcasters. The receiving agent shall be under no obligation to negotiate any such agreement. The receiving agent shall have no obligation to any copyright owner of sound recordings or any other person entitled to payment under this section in negotiating any such agreement, and no liability to any copyright owner of sound recordings or any other person entitled to payment under this section for having entered into such agreement.

(B) The Copyright Office shall cause to be published in the Federal Register any agreement entered into pursuant to subparagraph (A). Such publication shall include a statement containing the

substance of subparagraph (C). Such agreements shall not be included in the Code of Federal Regulations. Thereafter, the terms of such agreement shall be available, as an option, to any commercial webcaster or noncommercial webcaster meeting the eligibility conditions of such agreement.

(C) Neither subparagraph (A) nor any provisions of any agreement entered into pursuant to subparagraph (A), including any rate structure, fees, terms, conditions, or notice and recordkeeping requirements set forth therein, shall be admissible as evidence or otherwise taken into account in any administrative, judicial, or other government proceeding involving the setting or adjustment of the royalties payable for the public performance or reproduction in ephemeral phonorecords or copies of sound recordings, the determination of terms or conditions related thereto, or the establishment of notice or recordkeeping requirements by the Copyright Royalty Judges under paragraph (3) or section 112(e)(4). It is the intent of Congress that any royalty rates, rate structure, definitions, terms, conditions, or notice and recordkeeping requirements, included in such agreements shall be considered as a compromise motivated by the unique business, economic and political circumstances of webcasters, copyright owners, and performers rather than as matters that would have been negotiated in the marketplace between a willing buyer and a willing seller, or otherwise meet the objectives set forth in section 801(b). This subparagraph shall not apply to the extent that the receiving agent and a webcaster that is party to an agreement entered into pursuant to subparagraph (A) expressly authorize the submission of the agreement in a proceeding under this subsection.

(D) Nothing in the Webcaster Settlement Act of 2008, the Webcaster Settlement Act of 2009, or any agreement entered into pursuant to subparagraph (A) shall be taken into account by the United States Court of Appeals for the District of Columbia Circuit in its review of the determination by the Copyright Royalty Judges of May 1, 2007, of rates and terms for the digital performance of sound recordings and ephemeral recordings, pursuant to sections 112 and 114.1

(E) As used in this paragraph--

(i) the term "noncommercial webcaster" means a webcaster that--

(I) is exempt from taxation under section 501 of the Internal Revenue Code of 1986 (26 U.S.C. 501);

(II) has applied in good faith to the Internal Revenue Service for exemption from taxation under section 501 of the Internal Revenue Code and has a commercially reasonable expectation that such exemption shall be granted; or

(III) is operated by a State or possession or any governmental entity or subordinate thereof, or by the United States or District of Columbia, for exclusively public purposes;

(ii) the term "receiving agent" shall have the meaning given that term in section 261.2 of title 37, Code of Federal Regulations, as published in the Federal Register on July 8, 2002; and

(iii) the term "webcaster" means a person or entity that has obtained a compulsory license under section 112 or 1142 and the implementing regulations therefor.

(F) The authority to make settlements pursuant to subparagraph (A) shall expire at 11:59 p.m. Eastern time on the 30th day after the date of the enactment of the Webcaster Settlement Act of 2009.

[(5) Redesignated (4)]

****

(j) Definitions.--As used in this section, the following terms have the following meanings:

****

(6) An "eligible nonsubscription transmission" is a noninteractive nonsubscription digital audio transmission not exempt under subsection (d)(1) that is made as part of a service that provides

audio programming consisting, in whole or in part, of performances of sound recordings, including retransmissions of broadcast transmissions, if the primary purpose of the service is to provide to the public such audio or other entertainment programming, and the primary purpose of the service is not to sell, advertise, or promote particular products or services other than sound recordings, live concerts, or other music-related events.

(7) An "interactive service" is one that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient. The ability of individuals to request that particular sound recordings be performed for reception by the public at large, or in the case of a subscription service, by all subscribers of the service, does not make a service interactive, if the programming on each channel of the service does not substantially consist of sound recordings that are performed within 1 hour of the request or at a time designated by either the transmitting entity or the individual making such request. If an entity offers both interactive and noninteractive services (either concurrently or at different times), the noninteractive component shall not be treated as part of an interactive service.

(8) A "new subscription service" is a service that performs sound recordings by means of noninteractive subscription digital audio transmissions and that is not a preexisting subscription service or a preexisting satellite digital audio radio service.

**\*\*\*\***

## 17 U.S.C. § 801

§ 801 Copyright Royalty Judges; appointment and functions

(a) Appointment.--The Librarian of Congress shall appoint 3 full-time Copyright Royalty Judges, and shall appoint 1 of the 3 as the Chief

Copyright Royalty Judge. The Librarian shall make appointments to such positions after consultation with the Register of Copyrights.

(b) Functions.--Subject to the provisions of this chapter, the functions of the Copyright Royalty Judges shall be as follows:

(1) To make determinations and adjustments of reasonable terms and rates of royalty payments as provided in sections 112(e), 114, 115, 116, 118, 119, and 1004.

(2) To make determinations concerning the adjustment of the copyright royalty rates under section 111 solely in accordance with the following provisions:

(A) The rates established by section 111(d)(1)(B) may be adjusted to reflect--

(i) national monetary inflation or deflation; or

(ii) changes in the average rates charged cable subscribers for the basic service of providing secondary transmissions to maintain the real constant dollar level of the royalty fee per subscriber which existed as of the date of October 19, 1976,

except that--

(I) if the average rates charged cable system subscribers for the basic service of providing secondary transmissions are changed so that the average rates exceed national monetary inflation, no change in the rates established by section 111(d)(1)(B) shall be permitted; and

(II) no increase in the royalty fee shall be permitted based on any reduction in the average number of distant signal equivalents per subscriber.

The Copyright Royalty Judges may consider all factors relating to the maintenance of such level of payments, including, as an extenuating factor, whether the industry has been restrained by subscriber rate regulating authorities from increasing the rates for the basic service of providing secondary transmissions.

(B) In the event that the rules and regulations of the Federal Communications Commission are amended at any time after April 15, 1976, to permit the carriage by cable systems of additional television broadcast signals beyond the local service area of the primary transmitters of such signals, the royalty rates established by section 111(d)(1)(B) may be adjusted to ensure that the rates for the additional distant signal equivalents resulting from such carriage are reasonable in the light of the changes effected by the amendment to such rules and regulations. In determining the reasonableness of rates proposed following an amendment of Federal Communications Commission rules and regulations, the Copyright Royalty Judges shall consider, among other factors, the economic impact on copyright owners and users; except that no adjustment in royalty rates shall be made under this subparagraph with respect to any distant signal equivalent or fraction thereof represented by--

  (i) carriage of any signal permitted under the rules and regulations of the Federal Communications Commission in effect on April 15, 1976, or the carriage of a signal of the same type (that is, independent, network, or noncommercial educational) substituted for such permitted signal; or

  (ii) a television broadcast signal first carried after April 15, 1976, pursuant to an individual waiver of the rules and regulations of the Federal Communications Commission, as such rules and regulations were in effect on April 15, 1976.

(C) In the event of any change in the rules and regulations of the Federal Communications Commission with respect to syndicated and sports program exclusivity after April 15, 1976, the rates established by section 111(d)(1)(B) may be adjusted to assure that such rates are reasonable in light of the changes to such rules and regulations, but any such adjustment shall apply only to the affected television broadcast signals carried on those systems affected by the change.

(D) The gross receipts limitations established by section 111(d)(1)(C) and (D) shall be adjusted to reflect national monetary

inflation or deflation or changes in the average rates charged cable system subscribers for the basic service of providing secondary transmissions to maintain the real constant dollar value of the exemption provided by such section, and the royalty rate specified therein shall not be subject to adjustment.

(3)(A) To authorize the distribution, under sections 111, 119, and 1007, of those royalty fees collected under sections 111, 119, and 1005, as the case may be, to the extent that the Copyright Royalty Judges have found that the distribution of such fees is not subject to controversy.

(B) In cases where the Copyright Royalty Judges determine that controversy exists, the Copyright Royalty Judges shall determine the distribution of such fees, including partial distributions, in accordance with section 111, 119, or 1007, as the case may be.

(C) Notwithstanding section 804(b)(8), the Copyright Royalty Judges, at any time after the filing of claims under section 111, 119, or 1007, may, upon motion of one or more of the claimants and after publication in the Federal Register of a request for responses to the motion from interested claimants, make a partial distribution of such fees, if, based upon all responses received during the 30-day period beginning on the date of such publication, the Copyright Royalty Judges conclude that no claimant entitled to receive such fees has stated a reasonable objection to the partial distribution, and all such claimants--

(i) agree to the partial distribution;

(ii) sign an agreement obligating them to return any excess amounts to the extent necessary to comply with the final determination on the distribution of the fees made under subparagraph (B);

(iii) file the agreement with the Copyright Royalty Judges; and

(iv) agree that such funds are available for distribution.

(D) The Copyright Royalty Judges and any other officer or employee acting in good faith in distributing funds under subparagraph (C)

shall not be held liable for the payment of any excess fees under subparagraph (C). The Copyright Royalty Judges shall, at the time the final determination is made, calculate any such excess amounts.

(4) To accept or reject royalty claims filed under sections 111, 119, and 1007, on the basis of timeliness or the failure to establish the basis for a claim.

(5) To accept or reject rate adjustment petitions as provided in section 804 and petitions to participate as provided in section 803(b)(1) and (2).

(6) To determine the status of a digital audio recording device or a digital audio interface device under sections 1002 and 1003, as provided in section 1010.

(7)(A) To adopt as a basis for statutory terms and rates or as a basis for the distribution of statutory royalty payments, an agreement concerning such matters reached among some or all of the participants in a proceeding at any time during the proceeding, except that--

> (i) the Copyright Royalty Judges shall provide to those that would be bound by the terms, rates, or other determination set by any agreement in a proceeding to determine royalty rates an opportunity to comment on the agreement and shall provide to participants in the proceeding under section 803(b)(2) that would be bound by the terms, rates, or other determination set by the agreement an opportunity to comment on the agreement and object to its adoption as a basis for statutory terms and rates; and

> (ii) the Copyright Royalty Judges may decline to adopt the agreement as a basis for statutory terms and rates for participants that are not parties to the agreement, if any participant described in clause (i) objects to the agreement and the Copyright Royalty Judges conclude, based on the record before them if one exists, that the agreement does not provide a reasonable basis for setting statutory terms or rates.

(B) License agreements voluntarily negotiated pursuant to section 112(e)(5), 114(f)(2), 115(c)(3)(E)(i), 116(c), or 118(b)(2) that do not result in statutory terms and rates shall not be subject to clauses (i) and (ii) of subparagraph (A).

(C) Interested parties may negotiate and agree to, and the Copyright Royalty Judges may adopt, an agreement that specifies as terms notice and recordkeeping requirements that apply in lieu of those that would otherwise apply under regulations.

(8) To determine the administrative assessment to be paid by digital music providers under section 115(d). The provisions of section 115(d) shall apply to the conduct of proceedings by the Copyright Royalty Judges under section 115(d) and not the procedures described in this section, or section 803, 804, or 805.

(9) To perform other duties, as assigned by the Register of Copyrights within the Library of Congress, except as provided in section 802(g), at times when Copyright Royalty Judges are not engaged in performing the other duties set forth in this section.

(c) Rulings.--The Copyright Royalty Judges may make any necessary procedural or evidentiary rulings in any proceeding under this chapter and may, before commencing a proceeding under this chapter, make any such rulings that would apply to the proceedings conducted by the Copyright Royalty Judges.

(d) Administrative support.--The Librarian of Congress shall provide the Copyright Royalty Judges with the necessary administrative services related to proceedings under this chapter.

(e) Location in Library of Congress.--The offices of the Copyright Royalty Judges and staff shall be in the Library of Congress.

(f) Effective date of actions.--On and after the date of the enactment of the Copyright Royalty and Distribution Reform Act of 2004, in any case in which time limits are prescribed under this title for performance of an action with or by the Copyright Royalty Judges, and in which the last day of the prescribed period falls on a Saturday, Sunday, holiday, or other nonbusiness day within the District of Columbia or the Federal

Government, the action may be taken on the next succeeding business day, and is effective as of the date when the period expired.

**17 U.S.C.A. § 803**

§ 803 Proceedings of Copyright Royalty Judges

(a) Proceedings.--

(1) In general.--The Copyright Royalty Judges shall act in accordance with this title, and to the extent not inconsistent with this title, in accordance with subchapter II of chapter 5 of title 5, in carrying out the purposes set forth in section 801. The Copyright Royalty Judges shall act in accordance with regulations issued by the Copyright Royalty Judges and the Librarian of Congress, and on the basis of a written record, prior determinations and interpretations of the Copyright Royalty Tribunal, Librarian of Congress, the Register of Copyrights, copyright arbitration royalty panels (to the extent those determinations are not inconsistent with a decision of the Librarian of Congress or the Register of Copyrights), and the Copyright Royalty Judges (to the extent those determinations are not inconsistent with a decision of the Register of Copyrights that was timely delivered to the Copyright Royalty Judges pursuant to section 802(f)(1)(A) or (B), or with a decision of the Register of Copyrights pursuant to section 802(f)(1)(D)), under this chapter, and decisions of the court of appeals under this chapter before, on, or after the effective date of the Copyright Royalty and Distribution Reform Act of 2004.

****

(d) Judicial review.--

(1) Appeal.--Any determination of the Copyright Royalty Judges under subsection (c) may, within 30 days after the publication of the determination in the Federal Register, be appealed, to the United States Court of Appeals for the District of Columbia Circuit, by any aggrieved participant in the proceeding under subsection (b)(2) who fully participated in the proceeding and who would be bound by the

determination. Any participant that did not participate in a rehearing may not raise any issue that was the subject of that rehearing at any stage of judicial review of the hearing determination. If no appeal is brought within that 30-day period, the determination of the Copyright Royalty Judges shall be final, and the royalty fee or determination with respect to the distribution of fees, as the case may be, shall take effect as set forth in paragraph (2).

**\*\*\*\***

## 17 U.S.C. § 804

§ 804 Institution of proceedings

**\*\*\*\***

(b) Timing of proceedings.--

**\*\*\*\***

(3) Section 114 and corresponding 112 proceedings.--

(A) For eligible nonsubscription services and new subscription services.--Proceedings under this chapter shall be commenced as soon as practicable after the date of enactment of the Copyright Royalty and Distribution Reform Act of 2004 to determine reasonable terms and rates of royalty payments under sections 114 and 112 for the activities of eligible nonsubscription transmission services and new subscription services, to be effective for the period beginning on January 1, 2006, and ending on December 31, 2010. Such proceedings shall next be commenced in January 2009 to determine reasonable terms and rates of royalty payments, to become effective on January 1, 2011. Thereafter, such proceedings shall be repeated in each subsequent fifth calendar year.

**\*\*\*\***

**37 C.F.R. § 380.7**

§ 380.7 Definitions.

For purposes of this part, the following definitions apply:

****

Performance means each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (e.g., the delivery of any portion of a single track from a compact disc to one listener), but excludes the following:

(1) A performance of a sound recording that does not require a license (e.g., a sound recording that is not subject to protection under title 17, United States Code);

(2) A performance of a sound recording for which the service has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events; and

(ii) Does not contain an entire sound recording, other than ambient music that is background at a public event, and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

****